IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION


**TERESA GRUBMAN,**               )
                                  )
        **Plaintiff,**            )
                                  )
**v.**                            )          **Case No. 3:06-cv-0705**
                                  )          **Judge Trauger**
**MORGAN STANLEY DW, INC.**       )
**& GREG DAVIS,**                 )
                                  )
        **Defendants.**           )


<u>**MEMORANDUM**</u>

Pending before the court is the Motion for Summary Judgment (Docket No. 20) filed by

the defendants, Morgan Stanley DW, Inc. (now Morgan Stanley & Co., Inc.) and Greg Davis.

For the reasons discussed herein, the defendants' Motion for Summary Judgment will be granted

in part and denied in part.


<u>**FACTUAL BACKGROUND**</u>

The plaintiff Teresa Grubman, a forty-two-year-old woman, was hired by the defendant

Morgan Stanley DW, Inc., on February 24, 2005 and began work in Morgan Stanley's Nashville,

Tennessee branch office on March 7, 2005.[1]  The plaintiff's employment agreement, titled

_____

[1]Unless otherwise noted, the facts are drawn from the parties' summary judgment briefs
(Docket Nos. 21, 29, and 38) and related affidavits and exhibits, as well as from the Defendants'
Statement of Undisputed Material Facts (Docket No. 22), the Plaintiff's Response to Defendants'
Statement of Undisputed Material Facts (Docket No. 30), and the Defendants' Responses to
Plaintiff's Statement of Additional Material Facts (Docket No. 37.)  Although facts are drawn
from submissions made by both parties, on a motion for summary judgment, all inferences are
drawn in the light most favorable to the non-moving party.  *See Matsushita Elec. Indus. Co. v.*

1

"Financial Advisor Trainee Employment Agreement," provided that her annual compensation would be $35,000 in "training compensation" for as long as she participated in Morgan Stanley's Professional Foundations Program ("PFP").   The PFP is a program for all newly hired Morgan Stanley financial advisors who do not bring to Morgan Stanley a sufficiently large book of business such that the advisor is considered a "recruit."  Generally, several newly hired financial advisors begin the PFP together as a "class," attending training sessions together, and sitting in a designated area of the office, known as the "bullpen."

The PFP is designed to guide these newly hired financial advisors through the first two to three years of their careers at Morgan Stanley.  The program begins with a 120-day period known as "pre-production," in which PFP participants study for and take licensing examinations, the passing of which will allow them to "go into production" in that state, *i.e.* sell securities and other financial products.  If the PFP participant is already licensed, as the plaintiff was, she does not need to take the licensing examinations, but she does need to wait 90 days for Morgan Stanley to "clear" her licenses.  During this 90-day period the already licensed PFP participant still attends, along with the rest of her PFP "class," group and individual training sessions designed to teach PFP participants about Morgan Stanley's products and its techniques for client acquisition.

After the financial advisors in the PFP either take their licensing exams or have their licenses "clear," they "go into production."  That is, they manage relatively small accounts

---

*Zenith Radio Corp.*, 475 U.S 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

($5,000-$10,000) Morgan Stanley gives them to manage and develop, and they begin to build a book of business on their own, through a variety of solicitation methods, including "cold calling" and "cold canvassing." According to Morgan Stanley policy, financial advisors in the PFP have eight months of production to generate $1,000,000 in "eligible assets." If, at the eight-month mark, a financial advisor in the PFP is short of $1,000,000 in eligible assets, termination is discussed, and, absent some dramatic change in circumstance, termination follows shortly thereafter. "Eligible assets" means accounts the PFP participant brings into Morgan Stanley and does not include accounts the PFP participant inherited from other advisors at Morgan Stanley, unless the PFP participant does something after inheritance that adds value to the account, such as reinvesting the account assets.

As mentioned above, the plaintiff was already licensed when she started at Morgan Stanley, and, after her licenses cleared in April 2005, she went into production, recruiting clients and attempting to build the required book of business. As part of this effort, the plaintiff entered into a partnership agreement with Rachel Schippers, another financial advisor who had worked for Morgan Stanley for approximately four years and had a book of business worth approximately $2.9 million. The partnership agreement, which Morgan Stanley approved, provided that Schippers and the plaintiff would split commissions on all partnered accounts. Under the agreement, the plaintiff helped manage Schippers' accounts, including placing trades and managing client expectations.

In late summer 2005, Schippers informed her superiors at the Nashville branch that she was taking a leave of absence. She planned to move from Nashville to Long Beach, California

3

to work for Morgan Stanley's office in Long Beach. After not being able to successfully transition, Schippers resigned from Morgan Stanley in September 2005.

Following Schippers' departure from the Nashville office, defendant Greg Davis, who took over as Morgan Stanley's Nashville branch manager on July 13, 2005, redistributed Schippers' accounts amongst the financial advisors at the branch, thereby removing them from the control of the plaintiff, who was managing Schippers' accounts under the partnership agreement. As part of this redistribution, Davis transferred the "Susan" account, whose value was estimated at between $500,000 to $2,000,000, from the plaintiff's control to the control of Marc Wilson, a younger, male financial advisor at the Nashville branch. Wilson had been with Morgan Stanley for about eleven years and had a book of business worth more than $100 million. Davis permitted the plaintiff to retain control over some of the smaller Schippers accounts. The redistribution of the larger Schippers accounts was an unfortunate development for the plaintiff; while she would not have been able to count the Schippers account assets toward her $1,000,000 goal, had she been able to retain control of those accounts and reinvested or converted the assets in a manner than added value for the client, then she would have been able to count those assets toward the $1,000,000 goal.

In the months following the redistribution of Schippers' accounts, the plaintiff continued to try to build a book of business, but she apparently had difficulty bringing in new clients. The plaintiff also perceived that Davis was restricting her efforts, in part by refusing her request to apply for a Texas license to pursue business leads in that state. On November 26, 2005, the plaintiff wrote a letter to Bernice Jee of Morgan Stanley's Human Resources Department. In the

letter, the plaintiff objected to the transfer of the Schippers' accounts and to Davis' refusal to allow her to pursue a license in Texas. She also voiced displeasure with Davis' generally unpleasant attitude toward her, writing that Davis was "snobbish" and "nasty" to her and referred to her as a "rookie."

In response to this letter, on December 13, 2005, the plaintiff and Davis met (separately and together) with a human resources representative from Morgan Stanley to address the issues the plaintiff raised. At this time, the plaintiff was advised that she had only about $20,000 in eligible assets, and therefore she was not on pace to meet her target of $1,000,000 by the end of her eight-month production period, which would fall on January 24, 2006. The plaintiff was also advised that any assets she strictly inherited from Schippers would not count toward her production period target, unless those assets were reinvested or converted to a different investment vehicle, adding value for the client.

On January 24, 2006, the last day of the plaintiff's production period, Bernice Jee wrote a memo to the plaintiff, in part responding to the plaintiff's November 26 letter, but also reiterating that the plaintiff was not on pace to meet her production period goals, as she only had about $26,000 in eligible assets. Jee advised that, unless the plaintiff could somehow generate the required $1,000,000 in business by March 1, she would be terminated.

On February 9, 2006, the plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission, asserting that the defendants had discriminated against her on the basis of her gender and age, in part by taking the Schippers accounts from her control and giving them to Wilson, a younger, male employee. The plaintiff also asserted that the defendants were threatening to terminate her for not meeting her production goals.

5

A week before filing the EEOC charge, the plaintiff went on short-term disability leave, due to a condition that plaintiff asserts was induced by the stress of her job and resulted in daily vomiting and constant pain.  In a February 24, 2006 letter from Morgan Stanley's Human Resources Department to the plaintiff, the company made it clear that the only reason the plaintiff would not be terminated effective March 1 was because she was on short-term disability leave at that time. The plaintiff also requested FMLA leave, which was granted as of her first-year employment anniversary on March 7, 2006.  The plaintiff came off of FMLA leave on April 10, 2006, after the March 1, 2006 deadline for meeting first-year production goals.  Rather than being allowed to return to work from FMLA leave, Morgan Stanley placed the plaintiff on unpaid administrative leave until her disability benefits expired on May 15, 2006, at which time she was terminated.

Lee Greer, a male financial advisor whom defendant Davis estimates was in his "late 20s to early 30s" in Spring 2005, joined Morgan Stanley around the same time as the plaintiff and was in her PFP "class."  Greer also approached the end of his eight-month production period short of his required production amount.[2]  Greer was not terminated in the same course as the plaintiff, but rather, in lieu of termination, was offered a new position in the financial advisor call center.  Greer's employment at Morgan Stanley ended after a few months at the call center.

The EEOC issued the plaintiff a right to sue letter on May 31, 2006, and the plaintiff commenced this lawsuit on July 21, 2006.

## ANALYSIS

---

[2] The record does not make clear how short of his goals Greer was.

The plaintiff claims that she was subjected to discrimination on the basis of her gender in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and subjected to discrimination on the basis of her age in violation of the Age Discrimination in Employment Act (ADEA) of 1967, 29 U.S.C. § 621 *et seq.* The plaintiff also claims she was a victim of retaliatory conduct in violation of Title VII and the Family and Medical Leave Act ("FMLA") of 1993, 29 U.S.C. § 2601 *et seq.* The plaintiff also claims the defendants' actions constituted the common law torts of defamation and intentional infliction of emotional distress. The defendant has moved for summary judgment on these claims.

## I.     Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). To prevail, the moving party must meet the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

In determining whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). "The court's function is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir.

7

2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

If the non-moving party fails to make a sufficient showing on an essential element of the case with respect to which she has the burden, however, the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir. 1999). To preclude summary judgment, the non-moving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252). If the evidence offered by the non-moving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the non-moving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249-52. "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 431 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at 247-49).

## II.    Scope of EEOC Charge

As a preliminary matter, the defendants seek summary judgment on a jurisdictional basis on the plaintiff's Title VII and ADEA claims to the extent they relate to the plaintiff's termination from Morgan Stanley. The defendants argue that claims related to the plaintiff's termination are outside the scope of the plaintiff's lone EEOC charge, because the charge was made on February 9, 2006, while the plaintiff was still employed at Morgan Stanley, and

8

therefore prior to her termination.  (Docket No. 21 at 10-12.)

Federal courts do not have subject matter jurisdiction over Title VII and ADEA claims unless the claimant first unsuccessfully pursues the appropriate administrative relief for those claims.  *Ang v. Proctor & Gamble Co.*, 932 F.2d 540, 545 (6th Cir. 1991).  A claimant must have first presented her particular discrimination claims to the EEOC before they may be brought before the court.  *Id.*

This "exhaustion requirement," however, "is not meant to be overly rigid,  nor should it 'result in the restriction of subsequent complaints based on procedural technicalities or the failure of the charges to contain the exact wording which might be required in a judicial pleading." *Randolph v. Ohio Dept. Of Youth Servs.*, 453 F.3d 724, 732 (6th Cir. 2006) (quoting *EEOC v. McCall Printing*, 633 F.2d 1232, 1235 (6th Cir. 1980)).  As a result, "the EEOC complaint should be liberally construed to encompass all claims 'reasonably expected to grow out of the charge of discrimination.'" *Id.* (quoting *Haithcock v. Frank*, 958 F.2d 671, 675 (6th Cir. 1992)). Under this reasonable expectation test, "where facts related with respect to the charged claim would prompt the EEOC to investigate a different, uncharged claim, the plaintiff is not precluded from bringing suit on that claim."  *Weigel v. Baptist Hosp. of East Tennessee*, 302 F.3d 367, 380 (6th Cir. 2002) (citing *Davis v. Sodexco*, 157 F.3d 460, 463 (6th Cir. 1998)).

Here, the plaintiff indicated on her EEOC charge that Morgan Stanley, in conjunction with its ongoing discrimination, was actively threatening the plaintiff with termination.  (Docket No. 23 Ex. 1.)  These facts could be reasonably expected to prompt the EEOC to investigate the circumstances of the plaintiff's discharge.  *See Dixon v. Ashcroft*, 392 F.3d 212, 217 (6th Cir. 2004) ("the facts alleged in the body of the EEOC charge, rather than merely boxes that are

9

marked on the charge, are the major determinants of the scope of the charge.") Therefore, to the extent the plaintiff's Title VII and ADEA claims relate to her termination, those claims are properly before the court because they were within the scope of her initial EEOC charge.[3]

## III. Discrimination Claims

To prevail on her discrimination claims, the plaintiff may present either direct evidence of discrimination or circumstantial evidence creating an inference of discrimination. *See Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999). Here, the plaintiff does not attempt to present direct evidence of discrimination, and, therefore, she must establish a *prima facie* case of discrimination under the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). The burden of making out a *prima facie* claim of discrimination is "not onerous" and, when established, creates a "presumption that the employer unlawfully discriminated against the employee." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). If the plaintiff carries this relatively light burden, the defendant must then articulate a legitimate, non-discriminatory reason for its actions. *Id.* If the defendant articulates such a reason, the plaintiff must then show that the reason proffered is merely a pretext for discrimination. *Id.* at 255.

---

[3] In their reply brief, the defendants focus the court's attention on the Sixth Circuit's decision in *Cedar v. Premier Indus. Corp.*, No. 88-3340, 1989 WL 20615 at *1 (6th Cir. Feb. 28, 1989) (Docket No. 38 at 10-12.) The *Cedar* decision is not "directly applicable," as the defendants claim. Rather, in *Cedar*, the plaintiff filed an EEOC charge that "entirely" discussed an allegedly discriminatory demotion, and the court concluded claims related to the termination were not properly before the court, as they were not "reasonably expected" to grow out of the charge and, therefore, were outside the scope of the EEOC charge. Here, the EEOC charge dealt with ongoing discrimination and explicitly mentioned that termination as a result of that discrimination was being threatened. (Docket No. 23 Ex. 1.)

**A.      Gender Discrimination**

To establish the *prima facie* case of gender discrimination, the plaintiff must show (1) she is a member of a protected class, (2) she was subject to an adverse employment action, (3) she was qualified, and (4) she was replaced by someone outside of her protected class or was treated less favorably than a "similarly situated" male employee. *See Jacklyn*, 176 F.3d at 928. It is undisputed that the plaintiff satisfies the first three prongs of the *prima facie* case. It is also undisputed that she was not replaced. Therefore, to establish the final piece of her *prima facie* case, the plaintiff must show she was treated less favorably than a "similarly situated" male employee. To establish an employee as "similarly situated" to the plaintiff, the plaintiff must prove that, in all "relevant aspects" of the employment situation, she and her fellow employee are "nearly identical." *Leadbetter v. Gilley*, 385 F.3d 683, 691 (6th Cir. 2004). The court is to examine potential differences in job title, responsibilities, experience, and work record to evaluate whether two individuals are actually similarly situated. *Id.*

In her response brief, the plaintiff identifies two male employees as potentially similarly situated: Marc Wilson and Lee Greer. (Docket No. 29 at 15-17.) The plaintiff's argument that she was similarly situated to Marc Wilson, and therefore suffered gender discrimination when Davis transferred much of the Schippers' book of business to Wilson, is not tenable. (Docket No. 29 at 15-16.) The unchallenged distinctions between Wilson and the plaintiff are obvious. Wilson had been employed in the Nashville branch of Morgan Stanley for eleven years, was the second leading broker in the Nashville office, and had more than $100 million in client accounts under his control. (Docket No. 37 at 9-10.) The plaintiff, on the other hand, had worked for Morgan Stanley for a few months, had no sufficient business of her own, and was still "learning

11

the ropes" at Morgan Stanley. (*Id.*) Wilson and the plaintiff were not similarly situated for the purposes of the plaintiff's *prima facie* case of gender discrimination.

While the plaintiff was not similarly situated to Wilson, she was similarly situated to Lee Greer. Greer, a male employee, started working at Morgan Stanley's Nashville office around the same time as the plaintiff and was in the plaintiff's PFP "trainee class." (Docket No. 31 Ex. 4 at 11.) Greer and the plaintiff both were hired without any significant book of business, both took introductory training courses at the same time, both were subject to the eight-month production period goals at roughly the same time, and both had a very difficult time reaching those goals. (Docket No. 31 Ex. 4 at 14-15, 87-89.) For purposes of the plaintiff's *prima facie* case of gender discrimination, Greer and the plaintiff are plainly similarly situated.

In the final step of establishing her *prima facie* case, the plaintiff has the burden to show that she was treated less favorably than Greer. Plaintiff has met that burden. T.R. Keith, who was the "complex sales manager" for Morgan Stanley with "hiring, training, and recruiting responsibilities," testified at his deposition that Greer was also falling short of his production goals as the eight-month mark approached. (Docket No. 31 Ex. 4 at 87-89.) Instead of being terminated, Keith testified that Greer was given a "choice" of either taking a new job at the Morgan Stanley financial advisor call center, or being "terminated because he wasn't reaching his goals." (*Id.* at 88.) Greer took the new job for a few months before leaving Morgan Stanley. (*Id.*) According to Keith, Greer's transfer from the PFP to the call center was a reclassification to a "different position" that provided an "opportunity to further [Greer's] career," eliminating

12

any requirements that Greer meet production goals, and providing a flat salary plus bonus.[4]  (*Id.* at 88-89.)  There is nothing to indicate the plaintiff was offered a similar opportunity to further her career, despite also failing to meet production goals.  This clearly less favorable treatment of a similarly situated employee completes the plaintiff's *prima facie* case.[5]

As the plaintiff has established her *prima facie* case, the next step in the analysis requires the court to examine whether the defendant can articulate a legitimate, non-discriminatory reason for the differing treatment.  *Burdine*, 450 U.S. at 254.  The only potential explanation the court can locate is in the Defendants' Responses to Plaintiff's Statement of Additional Material Facts, in which the defendants cite to Davis' deposition testimony, in which Davis apparently explains that Greer was given the opportunity at the call center because "he had at least established himself as having the ability to open relationships."  (Docket No. 37 at 15.)[6]

_____

[4]  Davis testified at his deposition that he still considered Greer a "trainee" with "trainee goals."  (Docket No. 39 Ex. 2 at 159-160.)  While the inconsistency between the testimony of the defendants' witnesses does not aid their motion for summary judgment, it is also of little import, because it is undisputed that Greer was offered an opportunity that the plaintiff was not, despite the two being similarly situated.

[5]  In their brief, the defendants point out the plaintiff was given an additional five weeks of production to meet her goals, *i.e.* she was not fired on January 24, 2006, the day her eight-month production period expired, but was given until March 1 to acquire $1 million in assets. (Docket No. 21 at 13.)  This point is of little import for two reasons.  First, defense witness Todd Phillips, who had hiring and training responsibilities for Morgan Stanley's Nashville office, testified that the failure to generate $1 million in assets after eight months of production is grounds for termination, and the termination *discussion* usually begins with the employee after that eight months has expired.  (Docket No. 23 Ex. 4 at 50.)  Further, offering the plaintiff, who struggled for seven months to generate only $26,000 in assets, five weeks to generate another $974,000 in assets is hardly the same as offering a similarly situated employee a brand new job with no production requirements.

[6]  This specific passage in Davis' deposition was not provided to the court.

13

Even assuming that Davis' vague explanation satisfies the requirement that the defendant articulate a legitimate, non-discriminatory reason for differing treatment, the record reflects that the plaintiff has at least raised a fact issue as to whether this explanation is pretextual. To establish that an articulated, non-discriminatory reason for differing treatment is pretextual, the plaintiff must show that the reason either (1) has no basis in fact, (2) did not actually motivate the defendant, or (3) is insufficient to explain the defendant's actions. *See Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 573 (6th Cir. 2000). The Sixth Circuit has stated, where the explanation offered is vague such that it cannot be "later penetrated as false," such explanation is evidence of pretext and summary judgment for the defendant is inappropriate. *Asmo v. Keane, Inc.*, 471 F.3d 588, 596 (6th Cir. 2006). Here, the defendants' explanation is vague and uncertain as to time, place, and other details. Such an explanation is difficult to disprove and therefore evidence of pretext under *Asmo*. Further, to the extent that such a vague explanation can be shown to be false, the record raises a fact issue as to the falsity of the statement, as Davis, in his deposition, acknowledged that the plaintiff had opened accounts (*i.e.* relationships) worth up to $20,000 "on her own." (Docket No. 23 Ex. 2 at 185.)

As the plaintiff has established her *prima facie* case of gender discrimination, and the defendants have failed to articulate a legitimate, non-pretextual explanation for the differing treatment, the defendants are not entitled to summary judgment on the plaintiff's claim of gender discrimination.

**B.    Age Discrimination**

The *prima facie* case for age discrimination is rooted in the same framework as the

14

*prima facie* case for gender discrimination. *See Policastro v. Northwest Airlines*, 297 F.3d 535, 538-39 (6th Cir. 2002). The plaintiff must show that 1) she is a member of a protected group, 2) she was subject to an adverse employment decision, 3) she was qualified for the position she held, and 4) she was replaced by a "substantially younger" individual or received less favorable treatment than a similarly situated individual who was "substantially younger" than she. *Id.* The Sixth Circuit has established that, for purposes of this test, a plaintiff is not substantially older than her fellow employee if she is less than six years older. *Grosjean v. First Energy Corp.*, 349 F.3d 332, 340 (6th Cir. 2003).

It is undisputed that the plaintiff satisfies the first three prongs of the *prima facie* case.[7] As to the fourth prong, the plaintiff offers three employees for consideration as "similarly situated, substantially younger employees" – Marc Wilson, Lee Greer, and Jessica Jung. (Docket No. 29 at 17-18.) As discussed above, Marc Wilson was not similarly situated to the plaintiff, leaving Greer and Jung as potentially similarly situated and substantially younger employees.[8]

Both Greer and Jung are similarly situated and substantially younger for the purposes of this *prima facie* test. Both Greer and Jung were part of the plaintiff's "training class" and

---

[7] The defendants dispute whether the plaintiff was part of the protected class as defined under the ADEA (individuals forty years and older) when the alleged age discrimination arose. *See* 29 U.S.C. § 631(a). The plaintiff's date of birth is November 2, 1965, and therefore she was thirty-nine when she started working at Morgan Stanley, but forty when she was terminated. (Docket No. 30 at 1.) Because the events that would preclude summary judgment on the age discrimination claim undisputably occurred after the plaintiff turned forty, the plaintiff's "borderline" date of birth is not an issue.

[8] Mr. Wilson is also less than six years younger than the plaintiff, meaning he is not substantially younger, nor similarly situated. (Docket No. 37 at 9.)

15

therefore were similarly situated to the plaintiff, in that their level of experience at Morgan Stanley was the same, along with their work expectations and production goals. (Docket 31, Ex. 4 at 11, 14-15.) Also, both Greer and Jung are substantially younger than the plaintiff, for purposes of the *prima facie* test.[9]

The plaintiff has offered nothing but unsupported conjecture to suggest that she was treated less favorably than Jung. The plaintiff merely claims that she heard that the defendants provided Jung a solicitation opportunity that the plaintiff was not provided. (Docket No. 31 Ex. 1 at 254.) The plaintiff has provided no admissible evidence to support this claim and, therefore, she has not sufficiently shown Jung was treated less favorably than she was.

As discussed above, however, it is apparent that the plaintiff was treated less favorably than Greer, who, in lieu of termination for failing to meet production goals, was offered an opportunity to remain with Morgan Stanley in the call center, an offer that was not extended to the plaintiff. (Docket No. 31 Ex. 4 at 87-89.) As the plaintiff has shown that she was treated less favorably than a similarly situated, substantially younger employee, she has established her *prima facie* case of age discrimination.

Once the plaintiff has established her *prima facie* case of age discrimination, an identical burden is imposed on the defendant as in the gender discrimination context -- to articulate a legitimate, non-discriminatory reason for the differing treatment. *Grosjean*, 349 F.3d at 335. If

---

[9] There is no definitive evidence in the record as to exact ages of Jung and Greer, but in his deposition Davis estimated that Jung was in her early twenties "21, 22, 23, in that range" and Greer was "probably late twenties, early thirties." (Docket No. 23 Ex. 2 at 37-38.) Assuming Davis' estimates to be accurate, both individuals would qualify to be "substantially younger" than the plaintiff under the *Grosjean* standard.

16

the defendant articulates such a reason, the plaintiff must then come forth with evidence that the explanation given is pretext. *Id.* As discussed in the gender discrimination context, the defendants' explanation for why they treated Greer more favorably than the plaintiff, even if considered "legitimate" and "articulated," is still subject to the same pretext concerns addressed before. Therefore, defendants are not entitled to summary judgment on the plaintiff's claim of age discrimination.

**V.     Title VII Retaliation**

The plaintiff asserts that the defendants also violated Title VII by retaliating against her for reporting the alleged discrimination internally at Morgan Stanley, and, later, to the EEOC. (Docket No. 29 at 18-19.) Title VII provides: "It shall be unlawful employment practice for an employer to discriminate against any of his employees ... because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a) (2004).

Analysis of a Title VII retaliation claim supported by circumstantial evidence, such as the one plaintiff advances here, is conducted according to the *McDonnell Douglas/Burdine* burden shifting framework discussed above. To establish a *prima facie* case of retaliation under Title VII, a plaintiff must show 1) that she engaged in an activity protected by Title VII; 2) that this exercise of civil rights was known to the defendant; 3) that defendant thereafter took an employment action adverse to the plaintiff; and 4) that there was a causal connection between the protected activity and the adverse employment action. *Canitia v. Yellow Freight Sys., Inc.*,

17

903 F.2d 1064, 1066 (6th Cir. 1990). The plaintiff establishes the required causal connection under the fourth prong of the test by showing that "the adverse action was taken shortly after the plaintiff filed the complaint and by showing that he was treated differently from other employees." *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1080 (6th Cir. 1999).

Here, the plaintiff has established her *prima facie* case of Title VII retaliation. It is unquestioned that the plaintiff engaged in the protected activity of filing an EEOC charge, the defendants knew she had filed the charge, and the plaintiff suffered an adverse employment decision.[10] While the defendants are correct that the record indicates that the adverse action (*i.e.* the termination) did not occur because the plaintiff filed her EEOC claim, that is not the decisive issue because the record also reflects the plaintiff was treated differently from other, similarly situated employees who did not file an EEOC claim. As discussed above, Lee Greer, despite also failing to meet production goals, was given a choice of termination or the option to remain at the company in a different capacity. (Docket 31 Ex. 4 at 87-89.) The plaintiff, on the other hand, filed her EEOC charge on February 9, 2006 and, on February 24, 2006, was informed by Morgan Stanley's human resources department that she was not tracking to meet her $1,000,000 March 1, 2006 goal, the only reason she would not be terminated on March 1 was because she was on short-term disability leave, and she would be terminated as soon as that leave ended. (Docket No. 31 Ex. 1.)

---

[10] The parties dispute in their briefing whether the plaintiff's internal complaints to Morgan Stanley's Human Resources Department constitute protected activity under Title VII. It is unnecessary to resolve this dispute, however, because it is undisputed that plaintiff did engage in some protected activity, such as filing the EEOC charge, and the court concludes, as discussed below, the defendants are not entitled to summary judgment because they have not shown, as a matter of law, that the plaintiff was not retaliated against for engaging in that protected activity.

18

Once, as here, the plaintiff establishes her *prima facie* case of Title VII retaliation, the identical burden shifting analysis discussed in the gender and age discrimination contexts comes into play. *Singfield v. Akron Met. Housing Auth.*, 389 F.3d 555, 563 (6th Cir. 2004). The defendant must articulate a legitimate, non-retaliatory reason for the action the plaintiff asserts as retaliatory. *Id.* Once the defendant provides this explanation, the plaintiff can attempt to show the explanation provided is pretext. *Id.,* at 564.

The defendants' explanation for the disparate treatment between Greer and the plaintiff fails here on the same basis it did in the gender and age discrimination contexts. Even assuming the explanation that Greer "had at least established himself as able to open relationships" were articulated clearly enough to be considered a legitimate reason, the record reflects the explanation is pretext because it lacks a basis in fact and cannot be easily controverted. On these facts, a jury could reasonably conclude that the defendants retaliated against the plaintiff by not offering her a similar opportunity to Greer because the plaintiff had exercised her rights under Title VII. Therefore the defendants' motion for summary judgment on the plaintiff's Title VII retaliation claim will be denied.

## VI. FMLA Retaliation

The plaintiff also asserts that the defendants violated the FMLA by retaliating against her for taking medical leave permitted by that statute. (Docket No. 29 at 20-21.) The FMLA provides that "[i]t shall be unlawful for any employer to discharge or in any other manner discriminate against any other individual for opposing any practice made unlawful by the FMLA." 29 U.S.C. § 2615 (a)(2). Under this provision of the FMLA, courts have concluded

19

that a plaintiff establishes a *prima facie* case of FMLA retaliation when she can show 1) she availed herself of a right protected under the FMLA; 2) the exercise of those rights was known to the defendant; 3) she suffered an adverse employment decision; and 4) there was a causal connection between the protected activity and the adverse employment action." *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 314 (6th Cir. 2001). As in the Title VII retaliation context, the plaintiff can establish the "causal connection" prong of the *prima facie* case by showing that identically situated plaintiffs who did not take FMLA leave were treated differently for substantially similar conduct. *See Zhu v. Vanderbilt Univ.*, No. 06-0460, 2007 WL 2963980, *16 (M.D. Tenn. Oct. 5, 2007). Again, if the plaintiff establishes her *prima facie* case, the burden shifts to the defendant to articulate a legitimate reason for the differing treatment of the plaintiff, and, should the defendant be able to provide that explanation, then it falls to the plaintiff to prove pretext. *See Skrjanc*, 272 F.3d at 315.[11]

The plaintiff has established her *prima facie* case of FMLA retaliation. The parties do not dispute the first three prongs of the test and, under the fourth prong, the plaintiff has established a causal connection between taking FMLA leave and an adverse action, by showing

---

[11] In their summary judgment brief, the defendants "expressly reserve[d] the issue of whether a plaintiff can state a claim under the FMLA when the plaintiff alleges she was fired in retaliation for taking FMLA leave" because, they argued, such a cause of action was "judicially created" and currently being challenged before the Sixth Circuit, in *Bryant v. Dollar General*, No. 07-5006. (Docket No. 21 at 19.) In their reply brief, the defendants acknowledge the validity of retaliation claims under the FMLA, arguing that the plaintiff has not satisfied the *prima facie* case for FMLA retaliation. (Docket No. 38 at 21.) Notably, the Sixth Circuit recently decided *Bryant*, finding that, consistent with the "overwhelming consensus in the courts" "the FMLA itself prohibits employers from taking adverse employment actions against employees based on the employee's exercise of FMLA leave." 2008 WL 3540077, **6-7 (6th Cir. Aug. 15, 2008).

20

that an identically situated employee (*i.e.* Greer) who did not take FMLA leave was not terminated, despite also failing to reach supposedly mandatory performance goals. For the same reasons discussed above, the defendants' vague explanation as to why Greer was allowed to continue his employment but the plaintiff was not is, even if considered articulated and legitimate, pretext. Therefore, the defendants' motion for summary judgment on the plaintiff's FMLA retaliation claim will be denied.

## VII.  Intentional Infliction of Emotional Distress ("IIED")

In the Complaint, the plaintiff asserted that the defendants intentionally inflicted emotional distress on her, in that they "intentionally and/or recklessly harassed and ridiculed [her] because of her physical illness, outside activities, personal beliefs and values." (Docket No. 1 at 13.) In their motion for summary judgment, the defendants assert that the plaintiff has not provided evidence that the defendants engaged in conduct sufficiently "outrageous" to defeat summary judgment on her claim of IIED. (Docket No. 21 at 22.) The defendants are correct that a mere showing of discrimination and retaliatory conduct does not amount to IIED. *Jenkins v. Nashville Pub. Radio*, No. 02-0179, 2005 WL 3358871, at *4 (M.D. Tenn. Dec. 9, 2005). As this court noted in *Jenkins*, "[a]lleging a violation of anti-discrimination laws, without additional evidence that the conduct is so outrageous as not to be tolerated in civilized society, is simply insufficient to prove intentional infliction of emotional distress." *Id.* In her summary judgment response, the plaintiff does not discuss IIED, and she testified at her deposition that at "worst" Davis and others at Morgan Stanley were rude and belittling to her. (Docket No. 31 Ex. 1 at 390-91.) Conduct that is simply rude and belittling does not approach the level of intentional

21

conduct required to raise a fact question on IIED.  *Jenkins*,  2005 WL 3358871, at *4. Therefore, the defendants' motion for summary judgment on the plaintiff's IIED claim will be granted.

## VIII.   Defamation

In the Complaint, the plaintiff alleges that, after she left Morgan Stanley, subsequent job offers from eight other financial services companies were revoked after the companies asked Morgan Stanley about the plaintiff's previous work history.  (Docket No. 1 at 13.)  The plaintiff further alleged that she had spoken with one of these potential employers, who informed her that the offer of employment had been revoked because of statements made by Morgan Stanley representatives about the plaintiff.  (*Id*.)  As she admitted in her deposition, the plaintiff is unable to locate any evidence showing the substance of any communications between Morgan Stanley and any of her potential future employers.  (Docket No. 23 Ex. 1 at 408-410.)  In her summary judgment response brief, the plaintiff recasts her defamation claim, alleging that Morgan Stanley defamed her by writing in a "U5" termination form to the National Association of Securities Dealers that she was terminated for failing to meet training goals.  (Docket No. 29 at 23-24.)

In order to establish a claim for defamation under Tennessee law, the plaintiff must show that the defendant knowingly, recklessly, or negligently published a false and defamatory statement about the plaintiff.  *Sullivan v. Baptist Mem. Hosp.*, 995 S.W.2d 569, 571 (Tenn. 1999).  "Published" is a term of art, meaning that the defendant actually communicated the defamatory matter to a third person.  *Id.*

The plaintiff has failed to raise a fact issue on her defamation claim.  The statement the plaintiff offers as supposedly defaming comes in a May 22, 2006 e-mail from Alexa B. Pappas,

an Executive Director in Morgan Stanley's Law Division, who wrote to the plaintiff that Morgan Stanley "intends to submit a Form U5 indicating as follows: Discharge – Failure to satisfy training program requirements." (Docket No. 31 Ex. 11.) As the plaintiff has offered no evidence that Morgan Stanley ever actually submitted the form or communicated the statement "Discharge - Failure to satisfy training program requirements" to a third person, the plaintiff fails to show publication, a plainly necessary element of any defamation claim. Therefore, defendants are entitled to summary judgment on plaintiff's claim for defamation.

## **CONCLUSION**

The plaintiff has raised a genuine issue of material fact as to whether the defendants discriminated against her on the basis of gender and age and as to whether the defendants retaliated against her in violation of Title VII and the FMLA. As such, the defendants' Motion for Summary Judgment on each of these claims will be denied. The plaintiff has not, however, raised a genuine issue of material fact as to her claims of IIED and defamation, and the defendants' Motion for Summary Judgment on each of these claims will be granted.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge

23